# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-1918

_____

Jonathan Scarborough

*Plaintiff - Appellant*

v.

Federated Mutual Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: November 17, 2020
Filed: April 29, 2021

_____

Before COLLOTON, ARNOLD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Jonathan Scarborough sued his former employer, Federated Mutual Insurance Company (Federated), alleging that it retaliated against him in violation of the Minnesota Whistleblower Act (MWA). See Minn. Stat. § 181.932. The district

court[1] granted summary judgment to Federated, and Scarborough appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Federated is a property and casualty insurer that offers insurance primarily to businesses and business owners. Scarborough worked for Federated from 1998 until August 20, 2014, when Federated terminated his employment. From September 2012 until his termination, he worked as a Regional Marketing Manager (RMM), overseeing the Central Region and supervising six District Marketing Managers (DMMs). Among his various responsibilities as an RMM, Scarborough reviewed and approved DMMs' expense reports in accordance with Federated policy. His direct supervisor was Michael Pennington.

One of Scarborough's DMMs was Frederick Johnston. On July 2, 2014, a Marketing Administration Manager, Rhonda Kath, noted an irregularity in Johnston's June 2014 expense report for his company credit card—Johnston had charged $702.87 to the card to purchase customized framing for his personal photographs. When asked about the charges, Johnston lied and said they were for laminating company documents and buying printer ink. After confirming that Johnston did not in fact obtain these work-related services and materials, Kath raised the issue with her supervisor, Martha Kearin. Kearin in turn raised it with Pennington.

On July 7, 2014, Pennington met with Scarborough to discuss Johnston's suspected misconduct. At the meeting, Scarborough discussed Johnston's expense reporting activities and told Pennington that Johnston seemed to enjoy "nice and fancy" things, like holding meetings at the offices of the law firm Husch Blackwell

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

even though a cheaper venue was likely available. Pennington expressed some confusion and said that those meeting rooms were made available to Federated for free. Scarborough explained that Johnston nevertheless had been submitting invoices for reimbursement for those meetings. Later that same day, Pennington asked Kath to review Scarborough's June expense report, wanting to make sure that Scarborough had not charged personal expenses to the company credit card during a recent family vacation.

Scarborough decided to follow up on the Husch Blackwell matter, and on July 14, 2014, he confirmed that the law firm provided meeting rooms to Federated at no charge. Scarborough updated Pennington, and they resolved to meet with Johnston about his expense reporting activities. Meanwhile, Martha Kearin looked into Johnston's past expense reports as well as the invoices he submitted in support of his out-of-pocket expenses. She discovered that for years Johnston had been submitting falsified invoices for meetings held at Husch Blackwell's offices, totaling approximately $5,000. She also found that it was Scarborough who had approved the claimed expenses.

Scarborough and Pennington met with Johnston on July 21, 2014. Before the meeting, Pennington asked Scarborough if he had known that Johnston was falsifying invoices. Scarborough denied having any prior knowledge. During the meeting, Johnston admitted to lying about the $700 personal framing expenses and to submitting fraudulent invoices and receiving payment for them.

Several hours after the meeting, Johnston left a voicemail on Pennington's cell phone. In the message, he said that Scarborough had known all along that Husch Blackwell provided meeting rooms to Federated for free and had knowingly approved Johnston's falsified expense reports. Johnston also said that Scarborough had encouraged his other DMMs, including Johnston's office mate Braxton Weaver, to do the same thing.

On July 24, 2014, Scarborough and Pennington met with Pennington's direct supervisor, Mike Kerr, to discuss Johnston's misconduct. At the meeting, Kerr asked Scarborough whether he had known that Johnston had been falsifying invoices, and Scarborough again denied having any knowledge of the misconduct. On that same day, Pennington also called Braxton Weaver. Weaver told Pennington that Scarborough had known about Johnston's invoicing practices all along and had in fact recommended that Weaver contact Johnston for details on how to submit fraudulent invoices to pocket extra money.

On July 30, 2014, Scarborough, Pennington, and Kerr met again. Scarborough voiced his concern that Johnston's practice of submitting falsified invoices violated criminal and income tax laws. He also articulated his suspicion that, as a consequence of Johnston's misconduct, Federated was violating employment tax laws. During this same meeting, Kerr accused Scarborough of engaging in his own improper expense practices, including failing to use Federated's travel team to schedule work travel and misusing referral credits on a company cruise.

On August 4, 2014, Scarborough and Pennington met with Johnston. Pennington informed Johnston that because of his unethical expense reporting, Federated would not allow him to continue holding a marketing leadership position. Johnston's options were either to accept a demotion or to resign from the company.

After Johnston left the meeting, Pennington issued a warning letter to Scarborough for continuing to deny knowledge of Johnston's misconduct. Scarborough was allowed to stay in his RMM position, but he was warned: "Federated will not tolerate any future circumstances that call into question your integrity, violations of Federated policies, or acts of retaliation toward other employees – no matter how minor. In other words, any future misconduct will likely result in the termination of your employment with Federated."

Also on August 4, after the meeting with Pennington, Scarborough contacted Johnston's supervisees, without authorization, and told them what had happened with Johnston. Kerr found this to be "disappointing," both given the warning and because Johnston had not yet decided whether he would resign or remain with Federated. That same day, Pennington and Kerr also received a report from Kath concerning her review of Scarborough's June expense report. According to Kath, Scarborough had in fact charged personal expenses to his company credit card and had only recently expressed his desire to cut a check to Federated to cover those expenses retroactively.

On August 13, 2014, Scarborough, Pennington, and Kerr met again. Kerr told Scarborough he was being demoted, in part because of his "conduct, demeanor and judgment" during and after the investigation of Johnston's expense reporting misconduct. The demotion was also based on his own suspicious expense reporting practices and his overall behavior, which Pennington and Kerr agreed did not meet Federated's high standard for management. Given the option to either accept his demotion or resign from the company, Scarborough decided to stay with Federated.

Five days later, Kerr learned that Scarborough had called Christopher Terry, another RMM, to tell him that Federated might be looking to force him out of the company. According to Kerr, this was the "straw that broke the camel's back" and a further example of Scarborough's "gossiping," "lack of professionalism, [and] lack of integrity." On August 20, 2014, Kerr called Scarborough and terminated his employment with Federated.

Scarborough filed suit against Federated in Kansas state court on December 26, 2014, bringing claims for unjust enrichment and breach of an implied contract. Federated removed the case to the United States District Court for the District of Kansas, which subsequently transferred the case to the United States District Court for the District of Minnesota pursuant to a valid forum selection clause in

Scarborough's employment agreement. Scarborough amended his complaint to bring a single claim that Federated violated the MWA.

On February 1, 2017, the district court granted summary judgment in favor of Federated, finding that Scarborough "failed to show that his statements to Federated constituted a 'report' under the MWA" because they were not made with "the purpose of exposing an illegality." Scarborough v. Federated Mut. Ins. Co., No. 15-1633, 2017 WL 440244, at *4–5 (D. Minn. Feb. 1, 2017). On appeal, we vacated the district court's judgment and remanded for reconsideration in light of Friedlander v. Edwards Lifesciences, LLC, 900 N.W.2d 162 (Minn. 2017), which recognized that a 2013 amendment to the MWA "eliminated the judicially created requirement that a putative whistleblower act with the purpose of exposing an illegality." Scarborough v. Federated Mut. Ins. Co., 894 F.3d 1277, 1278–79 (8th Cir. 2018) (quoting Friedlander, 900 N.W.2d at 166).

On March 29, 2019, the district court again granted summary judgment in favor of Federated, concluding that "Scarborough ha[d] not pointed to sufficient evidence that reasonably support[ed] a causal link between [his] reports [of Johnston's misconduct] and the adverse employment actions." Scarborough v. Federated Mut. Ins. Co., 379 F. Supp. 3d 772, 782 (D. Minn. 2019). In the alternative, the district court reasoned that even assuming Scarborough could make out a prima facie case of retaliation, he pointed to no evidence that created a genuine issue of fact for trial that Federated's proffered non-retaliatory reasons for warning, demoting, and terminating him were pretextual. Id. at 782–83.

II.

"We review a district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences that can be drawn from the record." Pedersen v.

Bio-Medical Applications of Minn., 775 F.3d 1049, 1053 (8th Cir. 2015) (cleaned up). "We will affirm if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Naguib v. Trimark Hotel Corp., 903 F.3d 806, 811 (8th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); see also Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." (cleaned up)); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013) ("[A]lthough the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations . . . ." (cleaned up)).

The MWA provides in relevant part that "[a]n employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee" because the employee, acting in good faith,[2] "reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer." Minn. Stat. § 181.932 subdiv. 1(1). A plaintiff may prove a retaliation claim under the MWA "either by direct evidence or, in the absence of such evidence, under the familiar McDonnell Douglas burden-shifting framework." Pedersen, 775 F.3d at 1053–54 (cleaned up).

Scarborough has failed to provide any direct evidence that he was retaliated against for flagging Johnston's expense reporting activities. "Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Id. at 1054

---

[2]"[R]eports are made in 'good faith' as long as those reports are not knowingly false or made with reckless disregard of the truth." Friedlander, 900 N.W.2d at 165–66 (citing Minn. Stat. §§ 181.931 subdiv. 4, 181.932 subdiv. 3).

(cleaned up); see also Sellner v. MAT Holdings, Inc., 859 F.3d 610, 614 (8th Cir. 2017) ("'Direct' refers to the causal strength of the proof, not whether it is circumstantial evidence."). Scarborough's purported direct evidence of retaliation is that Pennington and Kerr punished him "for repeatedly and truthfully denying that he had prior knowledge" of Johnston's misconduct. Even assuming this characterization of events were supported by the record, it would not amount to direct evidence of retaliation because it does not support an inference that Scarborough was punished *because* he reported Johnston's suspected violations of law (*i.e.*, that Scarborough was retaliated against for participating in protected activity). Rather, it at most supports a very different inference—that Scarborough was punished because Pennington and Kerr mistakenly believed that he was lying about his prior knowledge of Johnston's expense reporting activities. This is a critical distinction, and the MWA prohibits only the former inference and not the latter.

Absent direct evidence, Scarborough must establish his retaliation claim using the McDonnell Douglas burden-shifting framework. Under that framework, the plaintiff has the initial burden to establish a prima facie case by showing (1) he engaged in protected conduct, (2) he was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action. Naguib, 903 F.3d at 811. "If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the action." Id. (cleaned up). "If the employer does so, the burden shifts back to the plaintiff to demonstrate that the stated reason is pretextual." Id. "The ultimate burden of proof then rests with the plaintiff to prove that the proffered reason is merely a pretext and that retaliatory animus motivated the adverse action." Pedersen, 775 F.3d at 1054.

The parties agree that Scarborough suffered an adverse employment action, see Chavez-Lavagnino v. Motivation Educ. Training, Inc., 767 F.3d 744, 749 (8th Cir. 2014) ("[A] retaliatory action is materially adverse if it would likely dissuade a

-8-

reasonable worker from engaging in protected conduct."), but they disagree on whether he established the other elements of his prima facie case.[3] We need not resolve the disagreement, as we assume Scarborough established a prima facie case of retaliation and proceed to determine whether he has presented a genuine issue of fact for trial on his claim by demonstrating that Federated's proffered non-retaliatory reasons for demoting and terminating him were pretextual. See Wood, 705 F.3d at 827 ("We may affirm a district court's grant of summary judgment on any basis supported by the record." (quoting Menz v. New Holland N. Am., Inc., 507 F.3d 1107, 1110 (8th Cir. 2007))); see also Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005) ("Because the record was fully developed in connection with the motion for summary judgment, we need not analyze each step of the burden-shifting framework on appeal, but instead may turn directly to whether there is a genuine issue for trial on the question of [retaliation] *vel non*.").

Once an employer has articulated a legitimate reason for taking an adverse action, "the plaintiff shoulders the ultimate burden of establishing a whistleblower

[3]As to whether he engaged in protected conduct, Scarborough contends he made three reports, each of which he argues amounts to protected conduct under the MWA: (1) on July 7, 2014, when he told Pennington that Johnston submitted expense reports seeking reimbursement for meetings held at Husch Blackwell; (2) on July 14, 2014, when he forwarded his email correspondence with Husch Blackwell to Pennington, confirming that the law firm provided meeting rooms to Federated free of charge; and (3) on July 30, 2014, when he suggested to Pennington and Kerr that Johnston's conduct likely violated criminal and tax laws and potentially caused Federated to be in violation of tax laws. Whether the July 7 statement amounts to protected conduct is a close call. At the time, Scarborough did not know the information he was providing about Johnston implicated a violation of any law. The July 14 and July 30 statements, however, were more than "mere report[s] of behavior that [wa]s problematic or even reprehensible," Kratzer v. Welsh Cos., 771 N.W.2d 14, 22 (Minn. 2009), because Scarborough by that time unquestionably suspected that Johnston's conduct violated criminal or tax laws. See Minn. Stat. § 181.932 subdiv. 1(1).

violation by demonstrating that the employer's reason is merely a pretext and that retaliatory animus motivated the adverse action." Pedersen, 775 F.3d at 1055 (quoting Hilt v. St. Jude Med. S.C., Inc., 687 F.3d 375, 378 (8th Cir. 2012)). "An employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification." Id. (quoting Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005)). "To prove pretext in a retaliation case, the plaintiff 'must both discredit the asserted reason for the adverse action and show the circumstances permit drawing a reasonable inference that the real reason for the adverse action was retaliation.'" Id. (cleaned up) (quoting Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007)).

Federated offers several reasons for demoting and terminating Scarborough: he knew of and approved Johnston's invoicing practices, encouraged Braxton Weaver to do the same, and lied about both; without authorization, he contacted Johnston's supervisees and told them about the disciplinary action taken against Johnston; he engaged in unethical practices, including belatedly repaying Federated for personal expenses improperly charged to his company credit card and collecting cruise referral credits; and he spread a rumor to Christopher Terry that Federated was likely to force him out of his position. To Federated, these actions demonstrated Scarborough's lack of professionalism and integrity, and undermined his suitability to remain in the position of RMM.

Scarborough seeks to discredit Federated's stated reasons as pretextual on the grounds that they ignore the truth. See Mervine v. Plant Eng'g Servs., LLC, 859 F.3d 519, 527 (8th Cir. 2017) (noting that a plaintiff may demonstrate pretext by showing that the employer's stated reason had "no basis in fact"). According to Scarborough, he truthfully denied having prior knowledge of Johnston's misconduct, and the rest of the proffered reasons are simply not true. However, "[i]n determining whether a

-10-

plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred."[4] Id. (quoting Macias Soto v. Core-Mark Int'l, Inc, 521 F.3d 837, 842 (8th Cir. 2008)). Scarborough has offered no plausible evidence to show that Pennington and Kerr did not in good faith believe that he lied about whether he knew of Johnston's misconduct or independently engaged in unethical behavior. Both Johnston and Braxton Weaver said that Scarborough knowingly approved Johnston's falsified expense reports, and Pennington and Kerr observed Scarborough engage in what they deemed to be inappropriate conduct for an RMM.

Scarborough insists that the real reason he was investigated, demoted, and then terminated is that Pennington was trying to cover up his own misdeeds by scapegoating Scarborough. He points to two sets of fraudulent reimbursement requests by Johnston for meetings held at Husch Blackwell in April and July 2012. These requests were presumably approved by Pennington, who was Johnston's RMM at that time, before Scarborough replaced him in September 2012. Scarborough contends that Pennington limited the temporal scope of the investigation into Johnston's expense reporting activity in a purposeful effort to direct attention away from his own wrongdoing. But the evidence shows that Pennington asked Martha Kearin to get Johnston's "receipts for the last couple years," a time span that would have included a portion of Pennington's tenure as Johnston's RMM. It was Kearin, not Pennington, who then narrowed the temporal scope to provide receipts dating back to June 2013. See id. at 528 ("The appropriate scope of an internal investigation . . . is a business judgment, and we do not review the rationale behind such a

---

[4]Scarborough maintains that this "honest belief doctrine" does not apply here because the stated grounds for disciplining him are "inextricably intertwined with the protected conduct at issue." Pye v. Nu Aire, Inc., 641 F.3d 1011, 1022 (8th Cir. 2011). We disagree because, as discussed below, Federated's proffered non-retaliatory reasons are related to Scarborough's personal misconduct and unrelated to his alleged protected activity. See id. at 1022–23.

decision." (quoting Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012))). Scarborough does not claim that Martha Kearin had an ulterior motive, and the fact that nothing prevented Pennington from asking for receipts from previous years does not create a genuine dispute of fact for trial that "[Federated's] investigation was a sham or that [Pennington] engineered or manipulated the process or the results to retaliate against [Scarborough]." Id.

Scarborough also contends that pretext may be inferred because he was treated less favorably than another RMM (MJ) who was demoted to a DMM position for engaging in expense reporting fraud. MJ was disciplined for using the company credit card for personal expenses that he misclassified as legitimate business expenses, directing other DMMs to do the same, and using Federated's communication tools to engage in unprofessional communications. While there is some overlap in the type of conduct alleged, Scarborough was also accused of endorsing and covering up a DMM's misconduct, improperly communicating with a co-worker's supervisees, and spreading rumors to another RMM about his possible termination. The record evidence shows that Scarborough and MJ "did not engage in misconduct of 'comparable seriousness,'" id., and their varied treatment does not establish pretext.

Ultimately, Scarborough's arguments fail because they do not "permit drawing a reasonable inference that the real reason for [the adverse actions] was retaliation." Pedersen, 775 F.3d at 1055. Federated claims that Scarborough was disciplined for lying about his knowledge of Johnston's invoicing practices, improper expense reporting, and unprofessional behavior during Federated's internal investigation. Put simply, Federated claims that it disciplined Scarborough for *his own* misconduct. In attempting to rebut these proffered reasons, Scarborough does not argue and provides no evidence that he was disciplined *because* he reported Johnston's suspected violations of law, that is, for engaging in protected activity. Scarborough has not established a genuine issue of material fact as to whether Federated retaliated against

him for blowing the whistle on Johnston, and the district court did not err by granting summary judgment on Scarborough's MWA retaliation claim.

## III.

We affirm the district court's grant of summary judgment.

_____